COMMONWEALTH *vs.* ROBERT FRANCIS.

Hampden. May 5, 2000. - August 22, 2000.

Present: MARSHALL, C.J., ABRAMS, GREANEY, SPINA, & COWIN, JJ.

*Homicide. Practice, Criminal,* Capital case, Opening statement, Confrontation of witnesses, Cross-examination by prosecutor, Jury and jurors, Examination of jurors. *Witness,* Credibility, Cross-examination, Limits on testimony. *Constitutional Law,* Confrontation of witnesses. *Evidence,* Rebuttal, Cross-examination, Prior misconduct. *Jury and Jurors.*

At a murder trial, the judge did not abuse his discretion in denying the defendant's motion for a mistrial based on the claim that the prosecutor had impermissibly vouched for a witness's credibility, where the judge concluded that the prosecutor had merely predicted what the witness would say. [356-357]

At a murder trial, the judge properly restricted the defendant's cross-examination of a witness regarding his residence and employment addresses, where the judge concluded that the witness's safety was threatened by such disclosure. [357-358]

At a murder trial, the judge erred in allowing the prosecutor to question the defendant about his alleged unlawful possession of a firearm for which the defendant had been arrested five weeks after the murder victim had been shot; however, the error could have had but slight effect in light of the judge's instruction to the jury that, because the defendant had been acquitted of the charge, they were required to find that he had not in fact possessed a gun as alleged [358-359]; further, the judge properly exercised his discretion to deny the defendant's motion for a mistrial on this issue [359].

At a murder trial, the judge properly allowed the prosecutor to cross-examine and present rebuttal evidence on an incident unrelated to the murder but occurring shortly thereafter, in which the defendant was stabbed, where the defendant opened the door to cross-examination on the subject. [359-361]

At a murder trial, the prosecutor improperly cross-examined the defendant about incriminating material derived exclusively from the inadmissible extrajudicial statements of a separately tried codefendant who did not testify at the defendant's trial; however, the prosecutor's use of the statements did not result in prejudice warranting reversal of the defendant's convictions, where the prosecutor did not refer to the matter in closing argument, where the judge correctly gave limiting instructions to the jury, and where the inadmissible evidence did not bear on the defendant's criminal liability or was merely cumulative. [361-367]

At a murder trial, the judge properly discharged a juror for good cause, substituted another juror, and instructed the jury, and no abuse of discretion was shown. [367-369]

At a murder trial, the judge properly exercised his discretion in refusing to conduct an individual voir dire of deliberating jurors to ascertain their exposure to asserted extraneous influences. [369-371]

A judge did not abuse his discretion in denying without a hearing a motion for a new trial filed by a defendant convicted of murder in the first degree, where the defendant did not submit evidence with any indicia of trustworthiness that would be admissible as declarations against penal interest or otherwise raise a substantial issue to establish that a new trial was warranted in the interests of justice. [371-373]

INDICTMENTS found and returned in the Superior Court Department on May 12, 1995.

The cases were tried before *John F. Moriarty*, J., and a motion for new trial, filed on October 23, 1998, was considered by *Daniel A. Ford*, J.

*Alan J. Black* for the defendant.

*Jane Davidson Montori*, Assistant District Attorney, for the Commonwealth.

MARSHALL, C.J. The defendant was convicted by a jury, as an accessory before the fact, of murder in the first degree by reason of deliberate premeditation.[1] He was also convicted, as an accessory before the fact, of three indictments charging armed assault with intent to murder and assault and battery by means of a dangerous weapon. G. L. c. 274, § 2. On appeal, he claims numerous errors that would warrant reversal of his convictions and requests relief pursuant to G. L. c. 278, § 33E. While his appeal was pending, the defendant filed a motion for a new trial based on newly discovered evidence that was referred to the Superior Court and denied without a hearing. His appeal from that order has been consolidated with his direct appeal from his convictions. We affirm the defendant's convictions and the order denying his motion for a new trial. We conclude that relief pursuant to G. L. c. 278, § 33E, is not warranted.

1. *Facts.* On the evening of February 28, 1995, Carlos Falcon and three other men were shot after leaving a Kentucky Fried Chicken (KFC) restaurant on State Street in Springfield. Falcon

---

[1]A defendant convicted as an accessory before the fact to murder in the first degree is entitled to review under G. L. c. 278, § 33E, because the punishment is the same as that for murder in the first degree and the offense, therefore, constitutes a "capital crime." *Patrick P.* v. *Commonwealth*, 421 Mass. 186, 193 (1995). *Commonwealth* v. *Angiulo*, 415 Mass. 502, 509-510 (1993).

died as a result of being shot once in the back of the head. The other three men survived.

Earlier that evening, members of two Springfield gangs known as Los Solidos and the Original Family Organization (OFO), a subordinate group whose members aspired to membership in Los Solidos, gathered in the apartment of Sharleen Alvarez located on the fourth floor at 659 State Street. Los Solidos members present were the defendant, Luis Berrios, Victor Figueroa, Johnny Sanchez, Luis Concepcion, and David Jiles. OFO members present were Daniel Rodriguez ("president" of OFO and the Commonwealth's cooperating witness in this case), Michael Borden, Jason Jiles, and Sharleen Alvarez.

The Commonwealth presented evidence that warranted a finding that the defendant was the "chief enforcer" of Los Solidos, responsible for taking care of the gang's guns, handling threats to the gang, and, during "wartime," exercising control over the gang in cooperation with its "warlord." There was testimony that, on the date of the shootings, Los Solidos were in a state of "war" with a rival gang, the Latin Kings.

Rodriguez testified that, at some point that evening, Concepcion and David Jiles entered the apartment and told the group that members of the Latin Kings were at the KFC "throwing signs," which meant that they were disrespecting Los Solidos by displaying their hand signal. When some of those present urged retaliation, the defendant took charge, stating, "Everybody just calm down. We going [*sic*] take care of this." He summoned Rodriguez, Borden, Jason Jiles, and Berrios into the bathroom, where he said, "If you can get those Kings, we got to do what we got to do." Jason Jiles responded that he would take care of it. The defendant then directed Rodriguez and Berrios to leave while he remained in the bathroom with Borden and Jiles.

Returning from the bathroom, the defendant told Rodriguez, "Don't worry about it. I'm gon' [*sic*] take care of it. Let me do my job." Jason Jiles, in the defendant's presence, picked up a .22 caliber semiautomatic handgun and said, "I'm going to do this." The defendant then instructed Jason Jiles to "[g]et a hoody," referring to a hooded sweatshirt, which Jiles put on before leaving the apartment. Borden also left the apartment at this time, and when Rodriguez asked where he had gone, the defendant told him not to worry about it. Borden often carried a .38 caliber revolver. Rodriguez testified that, shortly thereafter,

Jason Jiles returned to the apartment and said, "Those ain't Kings," to which the defendant responded, "They Kings. They Kings. Go do what you got to do and take care of it." Jason Jiles again left the apartment.

There was testimony by the Commonwealth's witnesses about the events outside the apartment. Just prior to the shooting, Carlos Falcon and three companions had left the KFC. The three men were seated inside Falcon's automobile, and Falcon was standing at the rear of the vehicle. A man matching the description of Borden approached and, after a brief verbal exchange, shot the three men in the vehicle with a .38 caliber revolver, wounding them. Jason Jiles, approaching from the rear, shot Falcon once in the back of the head with a .22 caliber handgun, killing him.[2]

Jason Jiles and Borden then returned to the State Street apartment, where they were congratulated by the others. Los Solidos "warlord," Johnny Sanchez, complained loudly to the defendant that the shooting was a mistake because it could "bring the heat down on us." The defendant responded, "They'll never figure this one out. Everybody just keep quiet." Portions of this exchange were overheard by Springfield police officers outside the apartment, who had responded to a report of the shooting. The police were admitted to the apartment by Sharleen Alvarez. Only Rodriguez was arrested at the time, on an outstanding warrant. The defendant was arrested approximately two months later when Rodriguez implicated him in the shootings in a statement to police.

2. *The prosecutor's opening statement.* In his opening statement, the prosecutor informed the jury that Rodriguez, a cooperating witness for the Commonwealth, had a criminal history, but had made no "deals" with the Commonwealth in return for his testimony, and that he was no longer associated with gangs and now lived a "straight and narrow life." The defendant moved for a mistrial, which was denied. He argues that this was

_____

[2]Jiles was tried separately and convicted as a principal on this homicide and the armed assaults. We affirmed his convictions. *Commonwealth* v. *Jiles,* 428 Mass. 66 (1998). Borden was taken into custody thirteen months after the defendant's convictions and subsequently pleaded guilty to murder in the second degree, conspiracy to commit murder, and three charges of assault and battery by means of a dangerous weapon. Berrios pleaded guilty as an accessory before the fact to murder in the second degree and accessory before the fact to three charges of armed assault with intent to murder and assault and battery by means of a dangerous weapon.

error because the prosecutor had impermissibly vouched for Rodriguez's credibility.

A prosecutor may not express a personal opinion as to the credibility of a witness or assert personal knowledge of the facts in issue. See *Commonwealth* v. *Trigones*, 397 Mass. 633, 642 (1986), and cases cited. See also Mass. R. Prof. C. 3.8 (h), (i), as appearing in 428 Mass. 1305 (1999). He may in general state in his opening anything that he "expects to be able to prove by evidence." *Commonwealth* v. *Fazio*, 375 Mass. 451, 454 (1978), and cases cited. The judge concluded, and we agree, that the prosecutor did not vouch for Rodriguez but merely "predict[ed] what the witness would say." This prediction was borne out at trial, as Rodriguez testified that the Commonwealth had made no promises to him to induce him to testify against the defendant, and that he had ceased his gang involvement and held steady employment at the time of trial. The judge properly exercised his discretion in denying the defendant's motion for a mistrial. See *Commonwealth* v. *Amirault*, 404 Mass. 221, 232 (1989).

3. *Witness confidentiality.* Prior to Rodriguez's testimony, the Commonwealth moved, pursuant to G. L. c. 258B, §§ 2, 3 (*d*), (*h*), to prevent defense counsel from cross-examining him about his address, telephone number, and place of employment, because he feared retaliation by gang members against himself or his family. The judge ruled that defense counsel could ask Rodriguez whether he was engaged in an occupation other than selling drugs, but not his specific employment or his employment address, and whether he now lived in western Massachusetts or in Connecticut, but not his city of residence or residential address. He also prohibited defense counsel from investigating these matters. The defendant argues that the restrictions infringed his right to confrontation guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. See *Smith* v. *Illinois*, 390 U.S. 129, 131 (1968); *Alford* v. *United States*, 282 U.S. 687, 692-693 (1931). We disagree.

· In *Commonwealth* v. *McGrath*, 364 Mass. 243, 251 (1973), citing *Smith* v. *Illinois, supra* at 133-134 (White, J., concurring), we held that a defendant's right to cross-examine a witness about his current address and place of employment may be restricted when the judge determines that a threat to the witness's safety from disclosure of this information outweighs

the defendant's need for it. See *Commonwealth* v. *Johnson*, 365 Mass. 534, 545 (1974). Here, the judge properly concluded that the risk to Rodriguez's safety was "inherent in the situation," thereby relieving the Commonwealth of its burden to demonstrate an actual threat to the witness.[3] *Commonwealth* v. *McGrath, supra,* citing *United States* v. *Daddano*, 432 F.2d 1119, 1128 (7th Cir. 1970), cert. denied, 402 U.S. 905 (1971). The judge then ascertained from defense counsel the defendant's need for information about the witness's current address and place of business, carefully weighed the defendant's interest in disclosure against the witness's interest in privacy, and concluded that the latter was sufficiently compelling to warrant the limitations described above. In all other respects, the defendant had "an open and meaningful opportunity to cross-examine" the witness. *McGrath* v. *Vinzant*, 528 F.2d 681, 685 (1st Cir.), cert. dismissed, 426 U.S. 902 (1976). By permitting general questions as to the witness's home State and employment,[4] the judge sought, and found, a compromise that allowed sufficient disclosure while minimizing any danger to the witness. See *Commonwealth* v. *Johnson, supra* at 546.

4. *Cross-examination of the defendant.* (a) The defendant testified at trial, and now claims that it was error for the judge to permit the prosecutor to question him about an incident that occurred approximately five weeks after the shootings: the defendant had been arrested and indicted, but subsequently acquitted by a jury, on the charge of possessing a firearm without a firearms identification card. G. L. c. 269, § 10 (*h*). Defense counsel objected repeatedly to the cross-examination concerning this incident.

The Commonwealth conceded at oral argument that it was er-

---

[3]The judge, following argument from counsel, stated that he was "satisfied that th[e] witness will be in very grave danger, physical danger of his life, if his whereabouts or home address or working address, for that matter, were to be revealed." Given the evidence concerning gang-related violence, and that Rodriguez was the Commonwealth's sole eyewitness to the defendant's participation in the crimes, this finding is fully supported. See, e.g., *Commonwealth* v. *Cobb*, 379 Mass. 456, 469-470, vacated sub nom. *Massachusetts* v. *Hurley*, 449 U.S. 809 (1980), appeal dismissed, 382 Mass. 690 (1981).

[4]Rodriguez testified on direct examination that he was now employed as a cook and that, since he had begun cooperating with the police, he had had no further gang involvement, had not lived in Springfield, and had not sold drugs. During cross-examination, he testified that his family members in Hartford, Connecticut, had introduced him to gangs and that he currently resided in Connecticut.

ror for the judge to allow the prosecutor to question the defendant about his alleged unlawful possession of a firearm; its relevance to the charges against the defendant was tenuous and was substantially outweighed by its potential to suggest the defendant's criminal propensity. On review of the record, we are convinced, however, that this error "did not influence the jury, or had but very slight effect." *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994) (preserved non-constitutional error). In response to the prosecutor's questions, the defendant denied that he had possessed a handgun, and told the jury that he had been found not guilty on the charge, responses that served to minimize the prejudicial impact of the improper questions. See *Commonwealth* v. *Stewart*, 375 Mass. 380, 388 (1978), citing *Commonwealth* v. *DeChristoforo*, 360 Mass. 531, 541 (1971). The judge then terminated the prosecutor's questioning when he asked the defendant about his arrest for this alleged misconduct. The prosecutor did not raise the matter again, and did not argue it in closing. Cf. *Commonwealth* v. *Rivera*, 425 Mass. 633, 646-647 (1997). During the prosecutor's cross-examination of the defendant, the judge instructed the jury that a witness's negative response to a leading question from counsel supplies no evidence for their consideration. See *Commonwealth* v. *Murphy*, 426 Mass. 395, 403 (1998). Both during the cross-examination and again in his final charge, the judge instructed the jury that, because the defendant had been found not guilty of the charge, they were required to find that he had, in fact, not possessed a gun as alleged. We presume that the jury followed these instructions, *Commonwealth* v. *Watkins*, 425 Mass. 830, 840 (1997), effectively negating any prejudice to the defendant. The judge properly exercised his discretion in denying the defendant's motion for a mistrial on this issue.[5]

(b) The defendant argues that it was error to permit the

---

[5]The defendant argues in the alternative that, because he had been acquitted of the unlawful possession of a firearm charge, the Commonwealth should have been barred from introducing evidence of this alleged misconduct on the ground of collateral estoppel. As a matter of Federal constitutional law, collateral estoppel does not bar the government in a criminal prosecution from introducing evidence from a separate prosecution on unrelated charges in which the defendant was acquitted. See *Krochta* v. *Commonwealth*, 429 Mass. 711, 716-717 (1999), citing *United States* v. *Felix*, 503 U.S. 378, 386 (1992), and *Dowling* v. *United States*, 493 U.S. 342, 348-349 (1990). We have not previously considered whether the Massachusetts Constitution affords greater protection to criminal defendants in this regard. See *Krochta* v. *Commonwealth*, *supra* at 718 n.14. Because we have concluded that the evidence

prosecutor to question him about an incident that occurred shortly after the shootings, in which he was stabbed, and to call a Springfield police officer to rebut a particular aspect of the defendant's testimony about the stabbing incident. There was no error.

The permissible scope of cross-examination rests largely in the sound discretion of the judge. *Commonwealth* v. *Gagnon*, 408 Mass. 185, 192 (1990). During cross-examination, the defendant first mentioned the stabbing to explain why he had left Los Solidos shortly after the shootings; he initially characterized the altercation that resulted in his injury as a "gang fight." He subsequently denied that there was any ongoing conflict between Los Solidos and the Latin Kings around the time of the shootings, and when the prosecutor recalled the stabbing incident, the defendant claimed not to know who had stabbed him or whether it was gang related. The prosecutor then impeached the defendant with a statement he previously had made to police in which he had identified his assailant as a Latin King. Defense counsel objected, and the judge curtailed any further inquiry about this incident.

The defendant opened the door to cross-examination on the issue. See *Commonwealth* v. *Magraw*, 426 Mass. 589, 595-596 (1998). Moreover, his initial assertion that he had been stabbed in a "gang fight" made the circumstances of the stabbing relevant to subsidiary facts at trial as it was probative of the existence of a state of "war" between Los Solidos and the Latin Kings. His subsequent denial of any knowledge of those circumstances or the identity of his assailant made his prior inconsistent statement to police relevant for impeachment purposes. See *Commonwealth* v. *Gil*, 393 Mass. 204, 219 (1984). There was no abuse of discretion in allowing the prosecutor to inquire as far as he did about the circumstances of the defendant's stabbing.

Nor was it error to allow the police officer to testify in rebuttal. Rebuttal evidence on a collateral matter may be admitted to impeach a witness's credibility. See *Commonwealth* v. *Ferguson*, 425 Mass. 349, 355 (1997), citing *Commonwealth* v. *Zezima*, 365 Mass. 238, 242 n.5 (1974), *S.C.*, 387 Mass. 748 (1982). The judge allowed the prosecutor to call the Springfield police officer who had taken the defendant's statement about the

was inadmissible pursuant to our law of evidence, we do not reach this constitutional issue.

stabbing for the limited purpose of rebutting the defendant's claim that the police had "bullied" and "pressured" him into making the statement, as he had testified. The rebuttal testimony "tended to cast doubt on the defendant's credibility because it created a basis from which the jury might infer that because the defendant's testimony [as to the voluntariness of his statement about the stabbing] was not accurate, other portions of his testimony also might be inaccurate." *Commonwealth* v. *Ferguson, supra,* quoting *Commonwealth* v. *Fleury-Ehrhart,* 20 Mass. App. Ct. 429, 434 (1985). It was, moreover, the defendant's denial of any knowledge of his assailant that prompted the Commonwealth to offer the rebuttal witness. The rebuttal testimony, brief and restricted in scope, was not likely to confuse the jury, and there was no unfair surprise to the defendant.[6] *Simon* v. *Solomon,* 385 Mass. 91, 107 (1982). There was no abuse of discretion.

(c) The Commonwealth filed a pretrial motion to introduce in evidence statements given to the police by Jason Jiles, who had previously been tried and convicted as a principal on this homicide. In these statements, in addition to confessing his own role in the crime, Jiles inculpated the defendant and reported numerous incriminating statements the defendant allegedly made the night of the shootings. The Commonwealth argued that the statements, although hearsay, were admissible because made by Jiles against his penal interest. The judge deferred ruling on the motion; he subsequently informed the prosecutor that he doubted that Jiles's statements were admissible. The Commonwealth did not call Jason Jiles at trial and did not offer his statements in evidence.

When cross-examining the defendant, however, the prosecutor used Jiles's statements, asking the defendant whether, when Jiles returned to the apartment and reported that the men at the KFC were not Latin Kings, he recalled telling Jiles to go "[l]ight up the car." The defendant denied making the statement. The prosecutor then asked the defendant whether he was aware that

---

[6]There is no merit to the defendant's claim that there was unfair surprise because the typewritten statement he made to the police was not provided to his counsel until the morning of the defendant's testimony. The judge repeatedly denied the Commonwealth's motion to introduce the typewritten report itself in evidence, and limited the prosecutor to questioning the defendant about whether he had given a statement to the police and what he had said about the stabbing and his attacker's identity. The defendant had access to this evidence independent of the police report.

Jiles had given a statement to police, to which the defendant responded affirmatively. The prosecutor then repeated the question about "light[ing] up the car." Although defense counsel did not object, the judge, sua sponte, called for a bench conference.

The judge admonished the prosecutor that, while he had a right to cross-examine about statements that he had a good faith basis to believe the defendant had made, that basis could not be supplied by Jiles's statements to police, which had been excluded from evidence. The judge remarked that it was plain to him, and likely also to the jury, that papers the prosecutor was holding were Jiles's statements. The prosecutor did not dispute this observation nor did he challenge that Jiles's statements had been excluded, but argued that their contents furnished him a good faith basis for inquiring about the defendant's incriminating statements. The judge appeared to accept this argument, ruling that the prosecutor could ask the questions, provided that he conceal from the jury any appearance that he was relying on Jiles's statements.

Defense counsel did not object, but the following day moved for a mistrial on the grounds, inter alia, that the prosecutor's reference to inculpatory statements that had been attributed to the defendant solely by Jason Jiles, a codefendant who had not testified, violated the defendant's Federal constitutional right of confrontation, citing *Douglas* v. *Alabama*, 380 U.S. 415 (1965). The judge denied the motion. The prosecutor proceeded, over objection, to ask the defendant six additional questions based on Jiles's statements.[7] The judge then interrupted and barred the prosecutor from asking any further questions based on the contents of Jiles's out-of-court statements, restricting him to

---

[7] The additional questions were (2) did the defendant recall asking Jason Jiles after the shootings what he did with the gun; (3) did he recall Jiles telling him he had "ducked" the gun into the woods behind the apartment; (4) did he recall telling Jiles after the shootings not to answer his telephone or pager; (5) did he recall telling Jiles, "Them are Kings. Them are Kings. Get back down there. Go do what you gotta do. Go take care of it"; (6) did he recall Jiles's having changed his clothes after the shootings; (7) did David Jiles and Luis Concepcion come into the apartment and inform him of Latin Kings at the KFC. Of the seven questions asked by the prosecutor, two dealt with matters that were also testified to by Rodriguez (questions 5 and 7); the defendant himself testified about another (question 6). These three questions, therefore, were not improper. See *Commonwealth* v. *Johnson*, 412 Mass. 318, 327-328 (1992) (not improper to cross-examine defendant about matters testified to by others, provided that defendant not asked to comment on credibility of another witness). Thus, only four of the prosecutor's seven questions about

inquiring about matters that were already in evidence through the testimony of other witnesses. On appeal, the defendant renews his claim that these questions infringed his right of confrontation under both the Sixth Amendment and art. 12.[8]

It was improper for the prosecutor to cross-examine the defendant about incriminating material that derived exclusively from the inadmissible extrajudicial statements of a separately tried codefendant who did not testify at the defendant's trial.[9] See *Douglas* v. *Alabama, supra* at 419-420. See also *Robbins* v. *Small*, 371 F.2d 793, 794-795 (1st Cir.), cert. denied, 386 U.S. 1033 (1967) (*Douglas* error where prosecutor, by using statement of unavailable witness, "indirectly but effectively brought to the jury's attention the substance of a statement that was not in evidence and, therefore, not subject to cross-examination"); *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 505-508 (1992) (witness's testimony as to incriminating portions of a nontesti-

---

matters contained in Jiles's statements are at issue here, the initial question regarding "light[ing] up the car" and questions 2-4 above.

[8]The defendant makes no claim that the right of confrontation under art. 12 affords greater protection than the Sixth Amendment and we do not address this issue. See *Commonwealth* v. *Keevan*, 400 Mass. 557, 568 n.9 (1987).

[9]The record does not indicate whether the judge made a final ruling on the admissibility of Jiles's statements. The prosecutor, however, was clearly aware that the judge considered the statements inadmissible, and the Commonwealth concedes on appeal that the statements had been excluded from evidence. The statements, which were offered as exceptions to the rule of hearsay exclusion as statements made by Jiles against his penal interest, see *Commonwealth* v. *Carr*, 373 Mass. 617, 623 (1977), would properly have been ruled inadmissible. Although they contained self-incriminating material and were generally against Jiles's penal interest, the statements clearly sought to shift blame to the defendant and others while exonerating Jiles or minimizing his own role in the crimes. Those portions of Jiles's statements inculpating the defendant thus lacked corroborating circumstances that would minimize the "hazards of fabrication or unreliability," and would not satisfy the test for admission as statements against a declarant's penal interest. *Id.* at 622. See *Commonwealth* v. *Charles*, 428 Mass. 672, 679 n.2 (1999), citing *Commonwealth* v. *Pope*, 397 Mass. 275, 280-281 (1986); *Commonwealth* v. *Lopera*, 42 Mass. App. Ct. 133, 137 (1997). Additionally, absent "particularized guarantees of trustworthiness," *Ohio* v. *Roberts*, 448 U.S. 56, 66 (1980), the admission in evidence of Jiles's extrajudicial confession inculpating the defendant when Jiles was unavailable for cross-examination would have implicated and violated the defendant's constitutional right of confrontation. See *Bruton* v. *United States*, 391 U.S. 123, 126-128, 135-137 (1968); *Commonwealth* v. *Keevan*, 400 Mass. 557, 569 (1987) (claimed *Bruton* error addressed in context of separate trials of codefendants); *Commonwealth* v. *Pope, supra* at 280 n.7. See also *Lilly* v. *Virginia*, 527 U.S. 116, 134-139 (1999) (plurality opinion).

fying codefendant's statement that the defendant had not adopted violated defendant's right of confrontation under *Douglas* v. *Alabama, supra*). A confrontation clause violation, to which there is objection, is subject to review for harmless error. See *Commonwealth* v. *MacKenzie, supra* at 509 n.11, citing *Brown* v. *United States,* 411 U.S. 223 (1973). Although this is a close case, we conclude that the prosecutor's use of Jiles's statements did not result in unfair prejudice warranting reversal of the defendant's convictions.

With respect to the first improper question, referring to the statement, "Go light up the car," the defendant did not timely object,[10] and our review is, therefore, limited to determining whether the prosecutor's use of this statement created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *MacKenzie, supra* at 509. It did not. Although the attributed statement was relevant to the defendant's guilt as an "accessory before the fact," it was cumulative of Rodriguez's lengthy testimony that portrayed the defendant as the man in charge on the night of the shootings. Rodriguez also told the jury of several incriminating statements the defendant made while encouraging and counseling the principals to commit the crimes. See *Commonwealth* v. *MacKenzie, supra* at 510-511 (cumulative nature of evidence conveyed through improper question minimizes likelihood of miscarriage of justice). See also *Arnold* v. *United States,* 511 A.2d 399, 411 (D.C. 1986) (no prejudicial *Douglas* error where statements in prosecutor's

---

[10]Although defense counsel, prior to trial, asserted the "confrontation clause" as a barrier to the admission of Jiles's statements in evidence, this objection was raised ten days before the prosecutor asked this first question. See *Commonwealth* v. *MacKenzie,* 413 Mass. 498, 508-509 (1992) (defendant's objection during voir dire of witness two days before witness testified at trial, where defense counsel was himself uncertain about admissibility of testimony, insufficient to preserve claim of confrontation clause violation for appeal). Moreover, the defendant did not object when the prosecutor asked the question, or when he repeated it; the judge, sua sponte, interrupted and questioned the prosecutor about the propriety of his tactic. Not until the next day did the defendant move for a mistrial, arguing a confrontation clause violation. Thereafter, he objected to all questions put by the prosecutor that appeared to be based on Jiles's statements. See *Commonwealth* v. *Pagano,* 47 Mass. App. Ct. 55, 59 (1999), cert. denied, 528 U.S. 1089 (2000), citing *Commonwealth* v. *Silvia,* 343 Mass. 130, 135-136 (1961) (where defense counsel objected to last two of five questions asked by prosecutor, objection not timely with respect to the earlier three questions). Cf. *Douglas* v. *Alabama,* 380 U.S. 415, 420-423 (1965).

improper questions "did not constitute 'the only direct evidence' " against defendant).

Additionally, this statement did not receive significant attention during the trial. The prosecutor asked a total of seven questions that referred to the contents of Jiles's statements, only four of which appear to have had those statements as their exclusive foundation. See note 7, *supra.* The defendant answered each, including the first, with a denial. In the course of the prosecutor's cross-examination of the defendant (albeit on another subject), the judge interrupted and instructed the jury that a leading question on cross-examination that receives a negative response from a witness does not constitute evidence for their consideration, an instruction he repeated in his final charge. The prosecutor did not refer to Jiles's statements in his closing argument. See *Commonwealth* v. *Jiles,* 428 Mass. 66, 75 (1998), quoting *Commonwealth* v. *Rivera,* 425 Mass. 633, 642 (1997) (in evaluating whether improperly admitted evidence creates substantial likelihood of injustice, we attach " 'great weight' to the fact that the 'the jury's attention was not in any way focused on [that evidence]' "). Thus, we are "substantially confident" that, had this question not been asked, the jury's verdict would not have been different. *Commonwealth* v. *Ruddock,* 428 Mass. 288, 292 n.3 (1998).

The defendant timely objected to the three additional questions based exclusively on Jiles's out-of-court statements. We must, therefore, determine whether the error in allowing these questions was "harmless beyond a reasonable doubt." *Commonwealth* v. *Vinnie,* 428 Mass. 161, 162, cert. denied, 525 U.S. 1007 (1998) (preserved constitutional error). One of these questions asked whether the defendant recalled Jiles telling him he had "ducked" the gun into the woods after the shootings. This did not refer to any incriminating statement made by the defendant, but rather to Jiles's own self-incriminating utterance after he committed the crime. No prejudice could have resulted from this question, as it did not bear on any aspect of the defendant's criminal liability. See *Commonwealth* v. *Libran,* 405 Mass. 634, 643 (1989), citing *Delaware* v. *Van Arsdall,* 475 U.S. 673, 684 (1986) (factors for harmless error review include "the importance of the improperly admitted testimony to the prosecution's case").

With respect to the remaining two questions (i.e., did the defendant recall asking Jiles what he did with the gun and tell-

ing Jiles not to answer his telephone or pager after the shootings), it is important to our analysis that the defendant was charged and convicted as an "accessory before the fact" to murder and various felony assaults. G. L. c. 274, § 2. Under the terms of the judge's clear and forceful instructions to the jury, only the defendant's conduct *prior* to the shootings (before the fact) was relevant to the offenses with which he was charged.[11] Both improper questions, however, recited statements the defendant allegedly made *after* the crimes had been committed; neither had the effect of suggesting that the defendant had counseled or procured Jiles or others beforehand to commit the shootings. This is not a case where improper questions referring to inadmissible evidence "bore on a fundamental part of the State's case against [the defendant]." *Douglas* v. *Alabama, supra* at 420. See *Commonwealth* v. *Libran, supra.*

Moreover, while the jury could properly have considered these two attributed statements as evidence of the defendant's consciousness of guilt — inasmuch as they suggested an effort to conceal the crimes, see, e.g., *Commonwealth* v. *Coonan,* 428 Mass. 823, 829 (1999); *Commonwealth* v. *Clarke,* 418 Mass. 207, 215 (1994) — in this regard the statements were cumulative of the testimony of Rodriguez, who testified that the defendant had instructed the other gang members in the apartment to keep quiet about the shootings. See *Commonwealth* v. *Libran, supra* at 643 (cumulative nature of improperly admitted evidence relevant to determining whether error harmless). The prosecutor's use of these statements when the defendant had no opportunity to cross-examine his codefendant and test his credibility thus did not "add[] critical weight to the prosecution's case." *Douglas* v. *Alabama, supra.* Bearing in mind the devastating testimony of Rodriguez, an eyewitness to the defendant's

---

[11]The judge instructed the jury that liability as an accessory before the fact requires proof beyond a reasonable doubt that the defendant counseled, hired, or procured the commission of a felony by persons who actually committed the criminal acts and that he shared their intent. He further instructed them that "to counsel" means to urge, encourage, advise or order a person to do an act and "to procure" means to bring the act about and, at the request of defense counsel, gave a supplemental instruction distinguishing an accessory before the fact from a joint venturer on the ground that the latter must be proven to have been present at the crime when it was committed and willing to assist. Moreover, the defendant was not tried as a conspirator or joint venturer, and any evidence of postshooting conduct among the various participants in these crimes was not directly relevant to the offenses with which he was charged.

actions, we are satisfied beyond a reasonable doubt that the prosecutor's improper use of these statements did not contribute to the jury's verdict. See *Chapman* v. *California*, 386 U.S. 18, 24 (1967).

5. *Discharge of deliberating juror.* At the beginning of the deliberations the judge was informed that a member of the jury, later identified as juror 5-2, wished to speak with him about her inability to remain impartial. In the presence of the defendant and his counsel, the judge conducted a voir dire of the juror, who linked her inability to remain impartial to "where [she] live[d]," more precisely, to the fact that there were gang members in her neighborhood and that this made her "afraid" and "nervous." She testified that she had not told other jurors that her fear arose from gang issues, but only that she was afraid to render a verdict due to the neighborhood where she lived.

After reviewing our decision in *Commonwealth* v. *Connor*, 392 Mass. 838 (1984), the judge conducted a further voir dire of the juror, again in the presence of the defendant and his counsel, this time asking specifically whether "[she had] a personal problem that's not related to the other jurors or [her] relationship with them or to [her] views on the case." She responded that her only problem was that the case "has to do with gangs," that this made her fearful, and that this problem was personal to her and unrelated to her views on the evidence in the case. The judge then inquired whether she wished to be discharged. When she answered in the affirmative, the judge, pursuant to G. L. c. 234, § 26B, and Mass. R. Crim. P. 20 (d), 378 Mass. 889 (1979), discharged her for "good cause," substituted an alternate juror, and instructed the jury that the reason for the juror's discharge had nothing to do with her views on the case or her relationship with her fellow jurors and that they were to begin their deliberations anew. Defense counsel timely objected to the juror's discharge and moved for a mistrial, which was denied.

General Laws c. 234, § 26B, provides that if, at any time after a case has been submitted to the jury and before the jury have agreed on a verdict, a juror "dies, becomes ill, or is unable to perform his duty for any other good cause shown to the court," the judge may discharge the juror, substitute an alternate selected by lot, and permit the jury to renew their deliberations. See Mass. R. Crim. P. 20 (d). In *Commonwealth* v. *Connor*,

*supra* at 844-846, we concluded that " '[g]ood cause' includes only reasons personal to a juror," that is, reasons unrelated to the "issues of the case," the juror's "views on the case," or "his relationship with his fellow jurors." In order to safeguard a defendant's right to trial by a fair and impartial jury, the judge must carefully scrutinize the reasons offered for discharging a juror at this critical stage of trial "to ensure that a lone dissenting juror is not permitted to evade [the] responsibilities" of his oath or to avoid the stress associated with persistently asserting a minority position in deliberations. *Id.* at 843, 846. See *Commonwealth* v. *Olszewski*, 416 Mass. 707, 722 n.15 (1993), cert. denied, 513 U.S. 835 (1994).

The judge adhered scrupulously to the procedural safeguards delineated in *Commonwealth* v. *Connor, supra* at 843-846.[12] Cf. *id.* at 846; *Commonwealth* v. *Perez*, 30 Mass. App. Ct. 934, 935 (1991). Moreover, we are satisfied that the record adequately supports the judge's finding that the juror's reason for seeking discharge was personal to her and unrelated to her views on the case or her relationship with her fellow jurors. See *Commonwealth* v. *Connor, supra* at 846.

Having heard the juror's testimony about the nature and source of her difficulty, the judge characterized her fear as the product of her residential surroundings coupled with "the nature of this case," and distinguished this latter from her views on the case, the issues it raised, or the evidence presented at trial. While this is, admittedly, a fine distinction, we think it neither untenable nor merely semantic. Although there was considerable evidence during trial about the organization and behavior of street gangs, nevertheless (as the judge clearly instructed the jury) such evidence was relevant only as it bore on the defendant's state of mind or motive for acting; the defendant's gang membership was not itself a triable issue in the case,

---

[12]The defendant claims that the judge's procedure was defective, because he discharged juror 5-2 without a hearing and without making adequate findings to support his determination that the "good cause" requirement had been satisfied. The record does not support this assertion. The judge conducted a voir dire of the juror in accordance with the requirements of *Commonwealth* v. *Connor*, 392 Mass. 838, 845 (1984). He then inquired of the two court officers who had contact with the jury, determining that neither had any information relevant to the juror's problem. See *Commonwealth* v. *Haywood*, 377 Mass. 755, 769-770 (1979). The judge expressly concluded that the juror's problem was fear and that it was a personal matter unconnected to her views on the case or on the evidence.

about which the jury were required to make a finding. Moreover, at jury empanelment, the judge inquired whether prospective jurors had experiences with, or feelings about, gangs that would affect their ability to remain impartial, and he excused one juror who responded affirmatively. It is likely that the judge had this very inquiry in mind when he identified the "nature of this case" as one source of the juror's difficulty, and we conclude that, as a juror's expression of fear and potential prejudice would have furnished a sufficient basis for excusing her prior to trial, see G. L. c. 234, § 28, as well as during trial but prior to deliberations, see *Commonwealth* v. *Maldonado*, 429 Mass. 502, 505-507 (1999), it was reasonably considered "good cause" for discharging her after deliberations had begun.

Additionally, we note, as did the judge, that during the course of the trial juror 5-2 twice failed to appear and had to be escorted to the courthouse by police. Commenting on how "upset" she appeared to be, the experienced judge was in a superior position to observe and assess the juror's demeanor on voir dire. We will not disturb this assessment on appeal. See, e.g., *Commonwealth* v. *Dickerson*, 372 Mass. 783, 794-795 (1977). Finally, the juror sought to be discharged on the first day on which the jury actually deliberated the case.[13] The timing of her request makes it unlikely that the jury were at an impasse or that the juror's difficulty was caused by stress associated with being a hold-out juror. See *Commonwealth* v. *Leftwich*, 430 Mass. 865, 874 (2000); *Commonwealth* v. *Connor*, *supra* at 846. In these circumstances, the juror's inability to perform her function as an impartial trier of fact for reasons entirely personal was a "demonstrable reality." *Commonwealth* v. *Connor*, *supra* at 846-847, quoting *People* v. *Collins*, 17 Cal. 3d 687, 696 (1976). The judge did not abuse his discretion in discharging her.

6. *Extraneous influences.* The defendant maintains that on three separate occasions the judge erroneously refused to conduct an individual voir dire of jurors regarding their possible exposure to extraneous influences. He also claims error in the judge's denial of his motion for a mistrial based on one such refusal. When a judge determines that the jury may have been exposed during the course of trial to material that "goes beyond the record and raises a serious question of possible prejudice,"

---

[13]After charging the jury the previous day, the judge, owing to the lateness of the hour, immediately suspended deliberations until the following day.

he should conduct a voir dire of jurors to ascertain the extent of their exposure to the extraneous material and to assess its prejudicial effect. *Commonwealth* v. *Jackson*, 376 Mass. 790, 800 (1978). "The facts of the specific case are important," *Commonwealth* v. *Kamara*, 422 Mass. 614, 616 (1996), and we review the judge's procedure for abuse of discretion. *Commonwealth* v. *Jackson*, *supra* at 799. We conclude, with respect to each of the defendant's claims of extraneous influence, that the judge properly exercised his discretion in refusing to conduct a voir dire of the other deliberating jurors.

(a) While the judge was deciding how to proceed with respect to juror 5-2, defense counsel requested an individual voir dire of the other jurors to ascertain if they had been exposed to this juror's expressions of fear and concern about gangs. The judge declined to address the matter until the issue of juror 5-2 had been resolved. Defense counsel did not thereafter renew his request for a voir dire on this issue until the day after the juror's discharge. The judge again declined, stating that such an inquiry would be more harmful than productive. Even treating counsel's request for a voir dire as timely and the issue as properly preserved for appeal, it was not error to deny the request. Juror 5-2 testified that, although she had expressed her fear to the other jurors, she had not discussed its basis other than to say that it was related to "where [she] live[d]." Later, after the juror had been discharged, the judge recalled her and specifically inquired whether she had discussed her fears with any of the other jurors, which she denied. There was, therefore, no basis for the judge to infer that juror 5-2 had been a source of any extraneous influence on the remaining jurors, let alone that her statements raised a serious question of possible prejudice. See *Commonwealth* v. *Jackson*, *supra*. Cf. *Commonwealth* v. *Kamara*, *supra* at 616-617 (individual voir dire of jurors properly conducted where, after judge had purged trial of any reference to gangs, one juror told others during deliberations that she knew defendant, knew he was gang member, thought him guilty, and was afraid to walk up street).

(b) On the second day of deliberations, a juror reported to the judge that the previous evening a number of jurors had been filmed by a television camera and watched by two young men in the parking lot as they left the courthouse. The juror, in response to the judge's question, stated that the incidents had not made her nervous about sitting on the case. Defense counsel

did not ask for a voir dire of the jury at this time, but later requested renewed inquiry of this juror and a voir dire of the other jurors concerning the two men who had observed them. The judge refused, concluding that this procedure could impair the jury's deliberations.[14] Because the juror's report to the judge, recounting a brief and innocuous incident involving two unidentified male observers, plainly did not "raise[] a serious question of possible prejudice,"[15] the judge's refusal to conduct a voir dire of the jury was a proper exercise of discretion. *Commonwealth* v. *Jackson, supra* at 800.

(c) On the morning of the third day of deliberations, the judge, following his regular practice, polled the jurors regarding, inter alia, their exposure to extraneous material, including newspaper coverage of the trial and "particularly . . . the Springfield Union News." Each juror, in turn, answered that he or she had complied with the judge's instructions the previous evening to avoid such media accounts of the trial, and the jury resumed deliberations. Defense counsel thereafter provided the judge two articles from the previous day's Springfield Union News — one concerning the discharge of juror 5-2, the other a memorial for the murder victim, Carlos Falcon — and moved for an individual voir dire of the jurors and a mistrial on grounds of extraneous influences. The judge denied the motions, stating that all members of the jury had just indicated their full compliance with his instructions, which specifically required them to avoid exposure to that particular newspaper, and that a voir dire on the matter was potentially harmful to deliberations. Clearly, having just determined that the jury had not been exposed to the extraneous influences in question, the judge properly exercised his discretion in denying the defendant's motions.

7. *Denial of motion for a new trial.* When Michael Borden was arrested approximately thirteen months after the defendant's convictions, he gave two statements to the police, in which he did not name the defendant as having been present in Sharleen

---

[14]This request was not timely, and our review is, therefore, limited to determining whether there was error that created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Cameron*, 385 Mass. 660, 669 (1982) (motion for mistrial based on extraneous influence, brought one day after incident, held untimely). Accord *Commonwealth* v. *Jackson*, 376 Mass. 790, 797 (1978).

[15]The judge, at the request of defense counsel, had inquired of juror 5-2 whether she was one of the jurors who had been in the parking lot the previous evening, which she denied.

Alvarez's apartment on the night of the shootings. He also gave a statement to a private investigator working for the defendant in which he claimed not to have seen or heard the defendant in the apartment. In all three statements, he identified Luis Berrios as the person who committed the acts alleged to have been committed by the defendant. While the defendant's appeal was pending, he moved for a new trial pursuant to Mass. R. Crim. P. 30 (b), 378 Mass. 900 (1979), claiming newly discovered evidence and submitting Borden's statements, along with affidavits from his appellate counsel and private investigator, as supporting evidence. The motion judge, who did not preside at the defendant's trial, denied the defendant's motion without a hearing, from which the defendant appeals. The discretionary decision to deny a motion for a new trial will not be reversed unless it is manifestly unjust or the trial was infected with prejudicial constitutional error. See *Commonwealth* v. *Nieves*, 429 Mass. 763, 770 (1999), and cases cited. Neither ground for reversal is present here.

In a carefully reasoned memorandum of decision, the motion judge ruled that Borden's statements, not being in the form of sworn affidavits,[16] did not comply with Mass. R. Crim. P. 30 (c) (3), 378 Mass. 900 (1979), had no corroborating circumstances or other indicia of trustworthiness that would render them admissible as declarations against penal interest, see *Commonwealth* v. *Charles*, 428 Mass. 672, 677, 679-680 (1999), and constituted, therefore, inadmissible hearsay. See *Commonwealth* v. *Stewart*, 383 Mass. 253, 258 (1981); *Commonwealth* v. *Carver*, 33 Mass. App. Ct. 378, 381 (1992). Alternatively, he reasoned, even if Borden's statements were admitted in evidence, numerous factual discrepancies rendered them inherently unreliable, such that they failed to raise a "substantial issue" necessitating an evidentiary hearing, Mass. R. Crim. P. 30 (c) (3), or to establish that a new trial was warranted in the interests of justice. Mass. R. Crim. P. 30 (b). See *Commonwealth* v. *Grace*, 397 Mass. 303, 305-306 (1986). Each

---

[16]Borden's statement to the private investigator, while it is labeled "affidavit," contains the phrase "I . . . swear," and is signed by both Borden and the investigator, was not verified by an oath before a magistrate or a notary public, nor does it affirm that Borden signed under the pains and penalties of perjury. See G. L. c. 268, § 1A. The motion judge, therefore, correctly ruled that it was not an affidavit. See *O'Brion, Russell & Co.* v. *LeMay*, 370 Mass. 243, 245 (1976); *Galvin* v. *Town Clerk of Winchester*, 369 Mass. 175, 177 (1975), citing *Murphy, petitioner*, 321 Mass. 206, 213 (1947).

of these reasons independently constitutes a sufficient basis for the judge's denial of the defendant's motion for a new trial.

With respect to the latter basis for denial, we note, as did the motion judge, that Borden's statements to the police and private investigator contradict one another concerning events in Alvarez's apartment the night of the shootings, and also contradict the defendant's own testimony at trial concerning his presence in the apartment that night. Moreover, these statements contradict the admission Borden made under oath when entering his plea of guilty to charges arising out of the shootings, see note 2, *supra,* in which he expressly agreed with the Commonwealth's statement of facts that identified the defendant as the person who instructed him and Jason Jiles to commit the crimes.[17] The numerous discrepancies and contradictions in Borden's various statements about the crimes illustrate that an affidavit of a nontestifying codefendant subsequently offered in support of the defendant's motion for a new trial is the "weakest sort of evidence." *Commonwealth* v. *Hennessey*, 23 Mass. App. Ct. 384, 385 (1987), citing *Commonwealth* v. *Grace*, 370 Mass. 746, 752 (1976). The judge acted within his discretion in denying the defendant's motion for a new trial.

8. *Section 33E review.* We have reviewed the entire record of the defendant's trial, pursuant to G. L. c. 278, § 33E (see note 1, *supra*), and conclude that neither a reduction in the jury's verdict nor an order for a new trial is warranted.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*

---

[17]Borden indicated some disagreement with the Commonwealth's statement of facts concerning his and Jason Jiles's respective roles in the shootings, prompting the prosecutor to restate and clarify these facts before the judge accepted Borden's plea. None of these disputed facts, however, concerned the defendant's role in directing Borden and Jiles to commit the crimes.