## COMMONWEALTH *vs.* BARRY J. KAMARA.

Suffolk. February 6, 1996. - May 8, 1996.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & FRIED, JJ.

*Jury and Jurors. Practice, Criminal,* Mistrial, Jury and jurors, Deliberation of jury, Examination of jurors. *Evidence,* Relating to deliberation by jurors. *Identification.*

In the circumstances of a criminal trial the judge correctly conducted separate voir dire of the deliberating jurors to evaluate the probable effect of their exposure to extraneous information presented by one of the jurors. [615-616]

At a criminal trial in which the deliberating jurors had been exposed to extraneous information presented by one of the jurors, the judge properly declined to declare a mistrial where he conducted individual voir dire of the remaining jurors, found the jury capable of continuing their work impartially, discharged the juror who disclosed the extraneous information and replaced her with an alternate, and gave the jurors appropriate instructions on how to proceed. [616-620]

At a criminal trial the prosecutor's attempts to introduce certain irrelevant evidence, while artless, did not amount to misconduct. [619-620]

INDICTMENTS found and returned in the Superior Court Department on June 7, 1991.

Motions to dismiss and to suppress evidence were heard by *Julian T. Houston,* J., and the cases were tried before *Robert A. Mulligan,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*John P. Zanini,* Assistant District Attorney, for the Commonwealth.

*Leo McAuliffe (Roger Witkin* with him) for the defendant.

WILKINS, J. On May 16, 1991, Ronald E. Taylor was fatally shot on Dakota Street in the Dorchester section of Boston, while he was walking to a bus stop with two friends. Two witnesses testified at trial that the defendant was the shooter, and both had previously identified a photograph of the defendant. The contested issue at trial was whether the

witnesses' identifications of the defendants were accurate. The jury returned verdicts of guilty of murder in the second degree and of possession of a firearm without a license.

The principal issue in the defendant's appeal concerns the problem that arose when, in the midst of the jury's deliberations, one juror told the judge and counsel that one of the deliberating jurors had discussed facts extraneous to the trial evidence. The Appeals Court disagreed with the trial judge's handling of the defendant's motion for a mistrial based on the disclosure of those extraneous facts to the jury and reversed the convictions. *Commonwealth* v. *Kamara*, 37 Mass. App. Ct. 769 (1994). We granted the Commonwealth's application for further appellate review. We affirm the convictions.

The question is whether, because of the jury's exposure to extraneous information, the judge had no choice but to declare a mistrial. The Appeals Court concluded that the extraneous material was highly prejudicial to the defendant and that a new trial was required. *Id.* at 771-772. In reaching this conclusion, the Appeals Court relied on principles expressed in *Commonwealth* v. *Fidler*, 377 Mass. 192 (1979), that it believed were controlling. *Commonwealth* v. *Kamara*, *supra* at 771 ("The situation here in fact mirrors *Fidler* . . ."). The *Fidler* case, however, concerned a jury that had returned a verdict and had been discharged by the time the judge became aware of the extraneous influence, *supra* at 193-194. In the *Fidler* case, the only practical choice was to evaluate "the probable effect of the extraneous facts on a hypothetical average jury." *Id.* at 201.

In this case, in contrast, word of the extraneous facts came to the judge before the jury had returned a verdict. The judge conducted a separate voir dire of the jurors and accepted the jurors' representations that they could decide the case on the evidence, uninfluenced by any extraneous information. The Appeals Court declared that "[i]n so doing, [the judge] committed error." *Commonwealth* v. *Kamara*, *supra* at 772. The trial judge did not err in this respect. He followed the right procedures and did exactly what this court has indicated should be done in such a case. See *Commonwealth* v. *Jackson*, 376 Mass. 790, 800-801 (1978), and cases cited. He assessed the capabilities of the still-sitting jury in light of their exposure to extraneous information; found the jury capable of continuing their work, except for the juror who had disclosed the

extraneous information; replaced that juror with an alternate; and gave the jurors appropriate instructions on how to proceed.

It remains for us to decide whether to accept the judge's ruling that the jury could consider the case impartially and not be influenced by the extraneous information some of them heard. There is no doubt, however, that our review is to be focused on the jury in this case, not on a hypothetical jury, and that we must give deference to the trial judge's conclusion. See *id.* at 799; *Commonwealth* v. *Stanley*, 363 Mass. 102, 104-105 (1973).

The standard that we apply here is no different from that applied when some prejudicial fact is injected into a case in some other way. A witness might blurt out extraneous information in a nonresponsive answer to a question. See *Commonwealth* v. *Clifford*, 374 Mass. 293, 298-299 (1978); *Commonwealth* v. *Costello*, 36 Mass. App. Ct. 689, 695-696 (1994). A juror might see the defendant in shackles. See *Commonwealth* v. *Tanner*, 417 Mass. 1, 4-5 (1994); *Commonwealth* v. *Samuel*, 398 Mass. 93, 96 (1986). Prejudicial information disclosed by the news media during trial may come to the attention of one or more jurors. See *Commonwealth* v. *Jackson*, *supra* at 797-798, 800-801. In such cases, when a claim of extraneous influence on a jury is raised, a trial judge must assess the possible prejudicial effect of the jury's exposure to extraneous information, and weigh the impact of that extraneous information on the jurors by conducting an individual voir dire of each juror. See *Commonwealth* v. *Rosenberg*, 410 Mass. 347, 352 (1991); *Commonwealth* v. *Jackson*, *supra* at 800-801. The judge should also consider the efficacy of curative instructions. See *Commonwealth* v. *Stanley*, *supra* at 105.

The facts of the specific case are important. On the morning of the second day of jury deliberations, a juror brought to the judge's attention that a woman juror had said during deliberations that she knew the defendant, that he was a friend of Eric Brown who dated her niece, that she thought the defendant did it, that he was a member of a gang, and that she was afraid to walk up the street. The defendant had contended that Eric Brown was the person who had shot the victim a few months before the murder, and implied, therefore, that he was also the person who had killed the victim.

The judge then questioned the juror who had presented the extraneous information to other jurors. She told the judge that she had told the jurors that she thought she knew Eric Brown, that the defendant and Brown were friends, and that "kids do hang out on corners," but that she did not say that the defendant was a gang member. At this point defense counsel asked for a mistrial. The judge questioned whether there was a manifest necessity for a mistrial and decided that he should interrogate each deliberating juror. That individual questioning disclosed that, in varying degrees, most jurors had heard some of the extraneous information discussed above.[1]

---

[1]The eleven original jurors who continued to sit after the judge denied the motion for a mistrial, successively stated the following as what they had heard the juror who was subsequently discharged say:

1. Someone she knew, perhaps a niece, knew Eric Brown or the defendant.

2. Her niece has a boy friend who is on trial for murder and might be the defendant. There were gangs in the neighborhood but she did not say that the defendant was a member.

3. She thought she knew Rick Brown. He may have dated her daughter or a friend of her daughter. There was a group of people you do not want to cross.

4. She knew the defendant or knew of him. This juror added that "[t]here were some references to things that were said in the court that were sustained, according to gangs, that she knew information regarding that." A family member knew the defendant. She knew the defendant was a member of a group or a gang.

5. She knew someone very close to the case. She recognized the defendant and one of the witnesses.

6. Her niece had a boy friend named Eric Brown who was a friend of the defendant.

7. She knew some of the people in the case. The juror could not remember what was said about the defendant being a gang member but acknowledged that something was said about it.

8. The juror could not understand what the excused juror said about what she knew. He did not hear her speak of gangs or groups.

9. Her niece was possibly connected to Eric Davis. The juror had no recollection of hearing anything about the defendant being a member of a group or gang.

10. She believed the defendant knew Mr. Brown, and she said something about the defendant and Brown being involved in a group.

11. She said that she knew the defendant who was a friend of Eric Brown who dated her niece, and that the defendant was a member of a gang or group, and she was afraid to walk up the street.

Each juror indicated under oath that he or she was confident that he or she could be fair and impartial and decide the case exclusively on the evidence that was presented, not influenced at all by any extraneous information that he or she had heard. The judge found on the record that each juror had answered his questions truthfully and had indicated unequivocally the ability to decide the case exclusively on the evidence presented in court, unaffected by any statement that the excused juror had made about matters not in evidence. The judge further found that no juror hesitated or expressed even any slight reservation or lack of confidence in his or her ability to decide the case exclusively on the evidence. When defense counsel was asked whether he thought any juror was not expressing his or her feelings and beliefs sincerely and honestly, defense counsel said that he did not disagree with the judge. He did, however, press for a mistrial because of the interjection of references to gangs and of an asserted connection between Eric Brown and the defendant.

The judge then rightly discharged the juror who had presented the extraneous information (see G. L. c. 234A, § 39 [1994 ed.]) and substituted an alternate juror. See *Commonwealth* v. *Patten*, 401 Mass. 20, 24 (1987). He instructed the continuing jurors to decide the case exclusively on the evidence that they had heard in court and to disregard anything that the discharged juror may have said. The jury deliberated for the balance of the day and asked for explanations of reasonable doubt and of murder in the first and second degrees. On the next day of deliberations, the jury deliberated until 4 P.M. when they sent a note to the judge that one of them could not make a decision "because of his background and emotions." The judge then gave a *Rodriquez* charge. See *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 101-103 (1973). At 6 P.M. the jury returned verdicts of guilty of murder in the second degree and of possession of a firearm without a license.

Although our analysis of this issue has proceeded on a course different from that pursued by the Appeals Court, we also arrive at the question whether the reference to gangs and gang membership so tainted the jury that the declaration of a mistrial was unavoidable. Assessing the reaction of an average hypothetical jury, as the Appeals Court did, one might well feel compelled to conclude that a mistrial was required

because one could not be certain of the absence of prejudice. As we have said, the issue need not be considered in the abstract. It may be, however, that the extraneous information so contaminated the jury that, despite their assurances that they sincerely believed that they could do the job right, despite the judge's finding that they could do so and that there was no reason to believe that they could not do so, and despite the judge's instructions to disregard any information not in evidence, we should conclude that the jury could not avoid being influenced in some prejudicial degree by the extraneous information.

Any possibility of taint because of the discharged juror's reference to gangs and to the defendant must be appraised in light of the evidence. The jury were well aware, as a jury would be on retrial, that this killing did not occur in an environment as to which the injection of the word "gang" would be jarringly disconcerting. The location of the killing, the purposeful seeking out of the victim to shoot him, the fact that someone had shot the victim three months earlier, and the testimony of the victim's mother that her son had problems with gangs in the neighborhood, unavoidably suggested the possibility of gang activity in relation to the victim's death. The judge, aware of such an inference being drawn, directed the prosecutor not to mention the words gang or group in final argument, and, at the defendant's request, expressly charged the jury before they began deliberations that they should not give any weight to gangs in their deliberations.[2]

Our assessment of the impact of the extraneous information on the jury must also include the circumstances of the prosecutor's attempt to establish that the defendant was a member of a gang that had threatened the victim. The defen-

---

[2]The instruction was as follows:

"Now at some point during this trial in excluded statements, statements that were stricken, you heard reference to gangs or a gang, singular. That word in our society today gives rise to only negative images and carries with it only negative connotations. You are to ignore and refrain from considering during your deliberations any such reference to gang or gangs, because I struck such references. They are not evidence in the case.

"So there is no such evidence before you relating in any way whatsoever to gangs, regardless of the meaning or image you attach to that term. So once again, you are totally to disregard, put out of your mind any reference in this case concerning a gang or gangs."

dant contends that the prosecutor acted improperly in seeking to establish this point. If the defendant had been affiliated with such a gang, the evidence was relevant. The prosecutor's expectation concerning his ability to prove such a link was significantly unfulfilled by the evidence. The judge assiduously guarded against the admission of disconnected references to gangs. The prosecutor seemed to fail to understand that the victim's fear of a gang could be relevant only if the defendant's affiliation with that gang was established. The defendant, however, contributed to the possibility of a perception of gang involvement by presenting evidence that Eric Brown had shot the victim in the leg three months before the murder. The prosecutor's attempts to introduce evidence about gangs may have been artless, but it did not amount to misconduct.

The defendant has cited no Massachusetts case, nor have we found one, in which, after individual voir dire of the jurors and explicit findings by the judge such as we have here, an appellate court has held that the taint of extraneous information was irremediable. We are not prepared to substitute our judgment for that of the trial judge who heard the evidence, carefully interviewed the jurors individually, and made a finding that each juror could do his or her job unaffected by whatever extraneous information had been injected into the jury room. Accordingly, the trial judge did not abuse his discretion in failing to order a new trial. See *Commonwealth v. Samuel*, 398 Mass. 93, 96 (1986) ("Determination of potential juror prejudice is a matter within the sound discretion of the trial judge"); *Commonwealth v. Palmariello*, 392 Mass. 126, 141-142 (1984); *Commonwealth v. Maltais*, 387 Mass. 79, 91-92 (1982); *Commonwealth v. Brown*, 386 Mass. 17, 30 (1982); *Commonwealth v. Tavares*, 385 Mass. 140, 156, cert. denied, 457 U.S. 1137 (1982).

The other issues that the defendant has raised require little discussion. The claim that the indictment should be dismissed because of the manner in which the case was submitted to the grand jury lacks merit, as does the claim that the evidence was insufficient to send the case to the jury. There was no error in the denial of the defendant's motion to suppress the photographic identifications of the defendant. The identification procedures were not unnecessarily suggestive.

*Judgments affirmed.*