Commonwealth v. Coles.

COMMONWEALTH vs. JASON COLES.

No. 97-P-1168.

Suffolk. January 9, 1998. - March 19, 1998.

Present: PORADA, KAPLAN, & BECK, JJ.

*Jury and Jurors. Practice, Criminal,* Deliberation of jury, Interrogation of jurors. *Evidence,* Relating to deliberation by jurors.

A criminal defendant demonstrated that the jury deliberations were influenced by extraneous information from some jurors' unauthorized visits to the scene of the alleged crimes; where the Commonwealth failed to demonstrate beyond a reasonable doubt that the defendant had not been prejudiced, the defendant was entitled to a new trial. [467-468]

INDICTMENTS found and returned in the Superior Court Department on December 6, 1994, and March 15, 1995, respectively.

The cases were tried before *Julian T. Houston,* J., and a motion for a new trial was heard by him.

*Brian J. Carney,* Assistant District Attorney, for the Commonwealth.

*Larni S. Levy,* Committee for Public Counsel Services, for the defendant.

KAPLAN, J. After jury trial, the defendant Jason Coles was convicted on indictments charging him with assault and battery upon one Janah Chapman by means of a dangerous weapon, a handgun; assault upon persons (unnamed) with a dangerous weapon, a handgun; possession of a firearm; and possession of ammunition. The trial judge, upon post-conviction motion, held that the convictions must be set aside for a new trial because the verdicts were contaminated by unauthorized visits by jurors to the scene of the alleged crimes. We hold that the judge did not abuse his discretion in so holding, and affirm his order. We give a sketch of the trial and then of the hearing on the post-conviction motion; finally, we assess the basis for the decision appealed from.

1. *Trial.* At 1:50 P.M., November 29, 1994, Cathedral High School in Boston signalled recess and 250 students (or more) made their way down the principal stairway onto Union Park Street. Father Brian Manning, chaplain, standing at the head of the stairs outdoors with Sister Patrice, dean of students, saw some unfamiliar youths emerging on the sidewalk on the opposite side of the street between the rectory and the church. The group grew larger and moved forward and began to encroach on the crowd of students gathering on the street. Anticipating growing trouble and hoping to quiet it down, Manning descended the stairs and found himself in the midst of a kind of circle that had formed itself; fighting had broken out; the situation was messy and "scary." Manning called to Sister Patrice for help. Roger Croake, athletic director, hastened out of the building down the steps and into the melee.

Gunshots rang out to the number of three or more. Manning said he saw a figure in the street facing the school building, crouching, with a gun in his left hand. Manning heard the shots and saw puffs of smoke from the gun. He said he recognized the shooter as Jason Coles (defendant), who had been a student at the school some two years previously (he was distinguishable, perhaps, by height, about six feet, three inches, and weight, as much as 240 pounds). Croake saw the shooter up against a parked car or van and recognized him as Jason Coles. A teacher, Crystal Murch, drawn to a third-story window of the school building, said she saw the shooter and he was Jason Coles. There was some testimony that the shooter had a hairdo of long hair, braided or in dreadlocks, and was wearing a black/green jacket.

Janah Chapman was struck in the buttocks by one of the gunshots; his position at the time could not be well established because he did not realize he had been shot until he had walked away from the scene. Another shot struck a window above an inner staircase of the school building customarily used by students; it lodged behind a bulletin board at the top of the staircase.

Although police were soon on hand, responding to a 911 call by Manning, no one was apprehended in the area; there was conflict about the exit route the supposed shooter had taken (via Harrison Avenue or Washington Street, the streets bordering on either side of the stretch of Union Park Street). Coles was later arrested at his home on the strength of the claimed identifications mentioned.

The issue in the case was identification of the shooter; there was no physical or other specific evidence that might tie the defendant to the commission of the crimes. The defense pressed the chances of misidentification, which would involve questions of vantage points, directions, distances, etc. Testimony by witnesses for the defense (mother, pastor, friend, and another) would indicate that the defendant was right- not left-handed; had always worn his hair close-cropped; owned a black/green jacket which he had worn regularly when a student and thereafter, but it was at the cleaners during a lengthy period which included the particular day.

2. *Jury reactions.* The case was tried on four days. On the day the jury retired to deliberate, Friday, October 20, 1995, they sent a message asking whether they might have access to the witness transcripts and the street maps (not received in evidence): answer, no. Later that day, the jury reported they would like instructions, as they were not able to reach a unanimous verdict on any of the indictments: answer, relax over the weekend. On Monday, the jury asked the judge to repeat the definition of "reasonable doubt"; they would like the definition in writing: answer, the judge reinstructed orally, denied a writing. Later that day the jury reported the same condition of being unable to reach any unanimous verdict, adding that each juror was voting with moral certainty. Court adjourned. Next day, when the jury assembled, the judge read them the *Tuey-Rodriquez* instruction. See *Commonwealth* v. *Rodriquez,* 364 Mass. 87, 102 (1973). Later the jury came in with verdicts of guilty on the four indictments.

3. *Post-conviction motion.* On July 26, 1996, defendant's counsel in effect moved for post-conviction inquiry of jurors and a new trial,[1] proffering the affidavit of co-counsel, Ms. Stacey A. Lyles. Lyles stated that on April 25, 1996, while walking by a "Souper Salad" restaurant on Tremont Street in Boston, she had eye contact with a woman seated at a table: Lyles recognized the woman as a juror at the Coles trial, the woman recognized Lyles as of counsel there. In conversation, the juror spontaneously, without hint or coaching, said some of the jurors had gone to the scene during the weekend intervening in the

---

[1]Technically the motion was for reconsideration of a motion to set aside verdicts which included a motion for post-verdict inquiry of jurors based on new information. The motion is to be understood as one for a new trial pursuant to Mass.R.Crim.P. 30(b), 378 Mass. 900 (1979).

deliberations and (quoting from the affidavit) "stood at various angles and had come back with 'totally different information than the lawyers presented.' "

(a) Juror A attended at court on January 23, 1997 (counsel on both sides being present), and under questioning by the judge (who had served as trial judge), said she was the juror who had spoken to counsel. She said a male juror who lived in the neighborhood of the school had gone to the scene — whether "specially" she did not know — "which he shared with us." A female juror, not from the neighborhood, also visited, "just to see, get a feeling." Both came to the "same conclusion" by seeing the site but juror A did not remember their comments.

Five jurors appeared under subpoena on February 7, 1997.

(b) Juror B, evidently the male juror mentioned by juror A, lived nearby and regularly passed near the site. He stopped briefly and made specific observations — size of street, the alley across the street (meaning presumably the space between rectory and church). He discussed features of the location with other jurors, and assisted from his knowledge in the jurors' drawing of their own map during deliberations.

(c) Juror C thought three jurors made visits, juror B, herself, and perhaps the foreman. The jurors knew she had driven by during deliberations. She had not gotten out of her car. The area looked like the pictures.

(d) Juror D knew of two visits, juror B's and her own. She went on the second day of deliberations — drove down Union Park Street, parked at the corner of Harrison, looked up and down, sat in front of the school. She looked for the alley. She discussed her observations with the other jurors. She had a problem with shooting angles and discussed this matter also. The jurors were drawing a map and juror B was assisting.[2]

(e) Juror E thought two males visited, juror B and the foreman; both were helpful in drawing the map, including placement of parked cars on the street, traffic, location of shooter, escape route. All this helped the jurors to "visualize."

---

[2]The judge and counsel were aware of the need to refrain as far as feasible from inquiring into the actual deliberations or debates that took place in the jury room reaching into the mental processes of jurors. "We recognize that the line between overt factors and matters resting in a juror's consciousness is not easily drawn, and difficult cases will arise. Nevertheless, we think it possible to draw the line in most cases, and, in any event, the better course is to try to do so rather than refuse to try." Commonwealth v. Fidler, 377 Mass. 192, 198 (1979).

(f) Juror F thought two males, juror B and the foreman, made visits. One of them discussed the distance between the shooter and the woman in the window.

4. *Decision.* The judge took charge of the interrogation of jurors and conducted the questioning himself, thus following a recommendation as to method set out in the leading case of *Commonwealth* v. *Fidler*, 377 Mass. 192, 201-202 (1979). As seen above, three jurors testified to their own visits and there was testimony that a fourth juror, the foreman, had also visited. All six testifying jurors spoke to the importation of the outside observations into the juryroom. The judge found that the defendant had sustained his burden of showing that the jury had (improperly) received extraneous information. See *Fidler* at 199-200. Cf. *Commonwealth* v. *Gilchrist*, 413 Mass. 216, 219-221 (1992); *Commonwealth* v *Scanlan*, 9 Mass. App. Ct. 173, 182-184 (1980). "It is clear," the judge wrote, "from the jurors' recollections that information from the unauthorized visits not only entered into their discussions, but likely played some significant role in the deliberative process." The burden then fell on the Commonwealth to show beyond a reasonable doubt that the defendant was not prejudiced by the extraneous matter. See *Fidler* at 201; *Commonwealth* v. *Cuffie*, 414 Mass. 632, 637 (1993). The possibility of prejudice resided in the fact that the extraneous matter consisted, as juror A told counsel, in "totally different information than the lawyers presented": the judge mentioned angles of the shooting, perception of the size of the street, jury-made map influenced by the offending jurors. Taking a "hypothetical average" jury as the reagent for measuring the effect of the improper interventions upon jury deliberations and action, see *Commonwealth* v. *Hunt*, 392 Mass. 28, 42 (1984); *Commonwealth* v. *Cuffie*, 414 Mass. at 637,[3] the judge could well conclude that the Commonwealth failed to carry its heavy burden to establish the absence of prejudice. The judge could conclude that the information imparted to the jury by the visiting jurors could have furnished the margin of rogue evidence that brought the jurors to the decision that the defendant was guilty. To put the point with procedural nicety, on the record made, the judge did not abuse his discretion under rule 30(b) in setting aside the convictions, which eventuates in new trial. See *Commonwealth* v. *Little*, 384 Mass. 262, 268-269 (1981); *Commonwealth* v. *Doherty*, 394 Mass. 341, 346 (1985).

---

[3]Reference to the "hypothetical" jury is another way of expressing the policy against inquiring into the mental processes of jurors. See note 2 above.

The Commonwealth has argued that the eyewitness testimony by the school people at trial was so powerful that by its light information from the outside must have had null effect. So says the prosecutor, but the jury were not so deeply impressed, as indicated by their two-day inability to bring in verdicts.[4] Similarly, there is no validity in the Commonwealth's attempt to diminish the jurors' testimony into the equivalent of a report of the appearance of Union Park Street by a casual walker-by. Cf. *Commonwealth* v. *Jones*, 15 Mass. App. Ct. 692, 694-696 (1983). As the court said in *Commonwealth* v. *Cuffie*, 414 Mass. at 637, while an unauthorized visit to the locus is not per se prejudicial, it is "potentially serious"; here the Commonwealth has not overcome this potentiality beyond a reasonable doubt. Cf. *Commonwealth* v. *Solis*, 407 Mass. 398, 402 (1990).

*Order allowing motion for new*
*trial affirmed.*

---

[4]Compare *Commonwealth* v. *Hunt*, 392 Mass. 28, 43 (1984), where the fact that a guilty verdict was rendered within one hour was thought overwhelmingly suggestive of guilt and thus bearing on the question whether the defendant was prejudiced by extraneous material.