COMMONWEALTH *vs.* JOSEPH A. FREDETTE.

No. 00-P-989.

Worcester. March 21, 2002. - October 11, 2002.

Present: LAURENCE, GILLERMAN, & MILLS, JJ.

*Jury and Jurors. Practice, Criminal,* Jury and jurors, Deliberation of jury,
   Isolation of jury, Question by jury, Argument by prosecutor, Loss of
   evidence by prosecution, Mistrial.

The judge at a criminal trial erred in failing to seek counsel's assistance when
   framing his answer to a note sent to him by the jury during their delibera-
   tions regarding a news program about the complainant that one of the
   jurors had seen, and in ignoring the prescribed procedures when there is
   the possibility of an extraneous influence on the jury; moreover, where the
   evidence against the defendant was far from overwhelming, and rested
   entirely on the jury's acceptance of the complainant's version of the events,
   and where the Commonwealth sought to bolster the complainant's cred-
   ibility, there was a substantial risk that the jury could take the information
   provided in the news program as strongly reinforcing the Commonwealth's
   portrayal of the complainant, and at the very least, the judge's mistakes
   deprived the defendant of the possibility of mitigating such a prejudicial
   impact on jury deliberations by means of prompt, clear, forceful, and
   specific limiting instructions. [255-262]
At the trial of indictments charging unnatural and lascivious acts with a
   thirteen year old complainant, the prosecutor's closing argument required
   reversal, where the prosecutor's sweeping proposition that victims of
   sexual abuse commonly delay disclosure of that abuse and maintain
   relationships with their abuser had not been the subject of testimony at
   trial, where such matters were beyond the common knowledge of jurors
   and would have required expert opinion to establish them, and where the
   argument went to the heart of the case. [262-265]
The judge hearing a motion to dismiss indictments did not err in refusing to
   dismiss the indictments based upon the loss of records relating to the case,
   where there was no bad faith on the part of the police who lost the records,
   where the defendant bore substantial responsibility for any prejudice aris-
   ing from the loss of the records because of the lengthy delay in prosecut-
   ing the matter caused by the defendant's flight to Canada to avoid prosecu-
   tion, and where the defendant failed to demonstrate any specific prejudice
   and relied on mere speculation that lost interview reports might have
   contained helpful impeachment material. [265-266]
At a criminal trial, the judge properly exercised his discretion in not declaring
   a mistrial when an investigating officer referred to trying to locate

"victims" after the discovery of the loss of police files, in light of the relatively harmless context in which the isolated reference occurred. [266]

This court declined to consider a claim of ineffective assistance of counsel where the record was insufficient and where the defendant's conclusory assertion was unsupported by reasoned argument or citation to authority, contrary to Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). [266-267]

INDICTMENTS found and returned in the Superior Court Department on October 16, 1992.

A motion to dismiss was heard by *Diane M. Kottmyer,* J., and the cases were tried before *James P. Donohue,* J.

*Alan J. Black* for the defendant.

*Beth R. Levenson,* Special Assistant District Attorney, for the Commonwealth.

LAURENCE, J. The defendant appeals from his 1995 convictions, after a jury trial, on three counts of unnatural and lascivious acts. G. L. c. 272, § 35.[1] We conclude that the cumulative prejudice to the defendant from defective jury procedures and the prosecutor's improper closing argument mandates a new trial.

*Background.* The incidents resulting in the convictions allegedly took place from 1971 to 1973, while the defendant was the executive director of Come Alive, Inc., a group home for troubled teenagers in Worcester. The defendant was then a priest and a member of the Assumptionist Order.[2] The complainants, who were both thirteen when the alleged incidents began, were among the delinquents committed to the defendant's care at

---

[1]The three convictions concerned acts alleged to have been committed on Sam Smith (a pseudonym). The defendant was acquitted at the same trial of another count of an unnatural and lascivious act and a count of assault and battery (G. L. c. 265, § 13A) against another alleged victim, Joe Jones (also a pseudonym). The Commonwealth had contemporaneously brought a third set of indictments against the defendant alleging similar offenses involving a third claimed victim but decided not to proceed on them prior to the trial, for reasons not revealed by the record.

[2]The record is unclear whether the defendant is still a priest of the Assumptionist Order. The Assumptionists' position appears to be that the defendant has not been a member of the Order since he formed a community of hermits in New Brunswick in 1984.

Come Alive by the Juvenile Court and the Department of Youth Services. The Worcester police department began investigating charges of abuse at Come Alive in late 1973 or early 1974.

The investigation resulted in the issuance of four criminal complaints in May, 1974, alleging several counts of abuse by the defendant against Jones. Smith denied that he had been abused by the defendant during that police investigation and made no abuse allegations against him until 1992.

After the allegations had come to light, but before the May, 1974, complaints were issued, the defendant removed to Canada, where he had been ordained.[3] Worcester authorities could not extradite him at that time because no extradition treaty between the United States and Canada was in force until March, 1976. Thereafter, no effort was made to extradite the defendant until 1992, when the Worcester police department reactivated the case (as the coincidental consequence of publicity surrounding the arrest of another priest on charges of sexual abuse of minors) and initiated extradition proceedings.

The defendant contested extradition but was delivered into the custody of United States officials in May, 1994. He brought a motion to dismiss the indictments in May, 1995, alleging violations of his rights to a speedy trial and due process because of the lengthy delay in prosecuting him and the loss of potentially exculpatory documents by the Worcester police department in the intervening years. After five days of evidentiary hearings the motion was denied, and the defendant was brought to trial and convicted of the three charges made by Smith.

*Extraneous influence during jury deliberations.* During their deliberations, the jurors sent the judge a note. It stated, in part,

---

[3]The defendant has consistently contended that he returned to Canada in 1974, at the direction of his religious superiors, to resume his conventional priestly duties after he had become physically and emotionally drained by his work at Come Alive. The Commonwealth has just as persistently charged, and the judge who denied his pretrial motion to dismiss (see *infra*) so found, that he "fled" to Canada to avoid prosecution. That issue does not affect our analysis regarding the errors requiring reversal.

that one of the jurors wanted to review Smith's testimony.[4] The judge brought the jury into the courtroom and read the entire note into the record, including the following: "The concern of the eleven other jurors is that this one juror watched a [television] news program on the case. It was an interview with [Sam Smith's] mother. The one juror doesn't feel this is swaying him." The judge did not ask for or provide an opportunity for comment by counsel regarding the note, the content of the interview, the extent of the jurors' knowledge thereof, or the procedure to be followed in light of the note. Instead, he stated, immediately after he had read the note into the record, "Well, as long as he doesn't feel that this is swaying him, then it shouldn't sway him." The judge then paraphrased the general cautionary instruction he had previously given the jury in his final charge (to decide the case solely on the evidence) and took no further action.[5] Defense counsel said and did nothing at that time.[6]

---

[4]The note came at a crucial point in the jury's deliberations. The jury had previously indicated to the judge that they had reached a verdict with respect to the allegations involving Jones (which proved to be "not guilty"), but were deadlocked eleven to one on the Smith charges. The jury had also asked for another explanation of the meaning of "beyond a reasonable doubt."

[5]The portion of the charge to which the judge referred said: "You, the jury, are the sole and the exclusive judges of the facts, and no one, not the judge, not the lawyers, not the witnesses nor anybody else is permitted to . . . tell you which witnesses you should believe, which witnesses you should disbelieve, what facts you should accept as having been established, what facts you should disregard . . . . The facts belong solely and exclusively to you, and you find the facts from the evidence, and the evidence came from a number of sources . . . from the testimony and from the exhibits [and] you may call upon your past experiences in life and you may draw reasonable inferences . . . from any facts that you determine to be true, accurate and worthy of belief. . . . Your verdict, whatever it may be, must not be influenced by any outside matters . . . such as bias, prejudice, sympathy, likes or dislikes." No explicit reference was made in the charge to the jurors' note or the interview it had mentioned.

[6]Although the transcript is ambiguous, the defendant appears to concede that he and his counsel were present at this time. No argument has been made on appeal challenging as ineffective defense counsel's conduct with respect to the judge's handling of the jurors' note; but even had it been, it would make no difference in our analysis. See *Commonwealth* v. *Curtis*, 417 Mass. 619, 624 n.4 (1994) (standard for measuring ineffective assistance of counsel differs little, if at all, from the standard of a substantial risk of a miscarriage of justice).

Only after the verdicts were returned and recorded did the defendant's counsel address the issue. He requested that the jurors be polled and that there be an individual voir dire of the jurors regarding their exposure to the extraneous information mentioned in the note and the effect it may have had on their deliberations. The judge complied with the request and questioned each juror.[7] Every juror denied that the information had influenced his or her verdicts.

The circumstances of the original juror's exposure to the extraneous information became clear during the voir dire. He recounted that while he was in his kitchen, the news program was playing on the television in the living room. He "heard something to the effect of Mrs. [Smith] asserting that her son was never a criminal until after he met [the defendant]." Although several jurors revealed knowledge of Mrs. Smith's interview and the fact that there had been some discussion of it in the jury room (see note 11 and accompanying discussion, *infra*), the defendant's motion for a "mistrial" was denied without argument or discussion.[8]

The judge's failure to seek counsel's assistance when framing his answer to the jurors' note was contrary to the established principles outlined in *Commonwealth* v. *Bacigalupo*, 49 Mass. App. Ct. 629, 632-633 (2000), where we said: "A defendant has a constitutional right to be present at all critical stages of

[7]Neither counsel nor the judge discussed the request or the voir dire procedure by reference to *Commonwealth* v. *Fidler*, 377 Mass. 192 (1979), which set forth the principles governing postverdict inquiry into extraneous influences on jurors. Counsel's request that the jurors be polled as to the influence exposure to the report of the television interview had on their deliberations and the judge's acquiescence thereto were both improper, the verdicts having been recorded. See Mass.R.Crim.P. 27(d), 378 Mass. 897-898 (1979). Any inquiry "concerning the actual effect of the [extraneous] matter on the juror's decision . . . [thereby] probing the juror's thought processes" is inappropriate. *Commonwealth* v. *Fidler*, 377 Mass. at 201, 204. As to the procedures governing voir dire with respect to extraneous facts before a jury has returned a verdict, see *Commonwealth* v. *Kamara*, 422 Mass. 614, 615-616 (1996).

[8]The defendant's untimely motion for a mistrial following the postverdict voir dire was technically a motion for a new trial pursuant to either Mass.R. Crim.P. 25(b)(2), 378 Mass. 896 (1979), or 30(b), 378 Mass. 900 (1979). See *Commonwealth* v. *Coles*, 44 Mass. App. Ct. 463, 465 n.1 (1998). The defendant has not appealed from or argued against the judge's discretionary denial of that motion.

criminal proceedings. . . . A critical stage in criminal proceedings includes those occasions when a judge is called upon to respond to a deliberating jury's communication which is of legal significance. . . . The assistance of counsel at that stage requires the judge, before he or she responds to such a communication, to afford counsel the opportunity to assist in framing an appropriate answer and to place on record any objections they might have to the course chosen by the judge. . . . The law requires a judge to allow counsel a meaningful opportunity to assist in the framing of the response to a jury's communication before an answer is given to the jury." See *Commonwealth* v. *Floyd P.*, 415 Mass. 826, 833 (1993); *Commonwealth* v. *Davis*, 52 Mass. App. Ct. 75, 78 (2001).

In addition to depriving the defendant of his constitutional right to such a meaningful opportunity by immediately responding to the jurors' note without eliciting counsel's participation, the judge ignored the procedures that have been prescribed when he becomes aware of "potentially extraneous influence on a jury . . . . [The judge must not only] determine whether the material goes beyond the record and raises a serious question of possible prejudice . . . including [determining] the likelihood that the material reached one or more jurors," *Commonwealth* v. *Jackson*, 376 Mass. 790, 800 (1978), but "must [also] assess the possible prejudicial effect of the jury's exposure to [the] extraneous information, and weigh the impact of that extraneous information on the jurors by conducting an individual voir dire of each juror." *Commonwealth* v. *Kamara*, 422 Mass. 614, 616 (1996).

Despite the judge's contravention of these requirements, the defendant raised no objection to the failure to provide him with a meaningful opportunity to participate in the response to a note that, at a minimum, revealed an extraneous influence in the jury room. Nor did he request that the judge take "appropriate steps to investigate," *Commonwealth* v. *Correa*, 437 Mass. 197, 200 (2002), the concern suggested by the fact that "the jury *may have been exposed*" to extraneous material that " 'raises a serious question of *possible prejudice*' . . . [by] conduct[ing] a voir dire of jurors." *Commonwealth* v. *Francis*, 432 Mass. 353, 369-370 (2000), quoting from *Commonwealth* v. *Jackson*, 376

Mass. at 800 (emphasis added). Accordingly, our review is limited to determining whether there was error that created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Francis, supra* at 370-371 & n.14.[9]

We conclude that the judge's preverdict and postverdict handling of the extraneous influence issue created such a substantial risk because it plausibly influenced the guilty verdicts in a material way. *Commonwealth* v. *Alphas*, 430 Mass. 8, 13 (1999). The judge's reliance on the conclusory and unspecific juror note to satisfy himself that the one juror who heard the television interview (whom the judge failed to question as "he was supposed to do," *Commonwealth* v. *Trapp*, 423 Mass. 356, 362-363, cert. denied, 519 U.S. 1045 [1996]) would not be "swayed" was multiply prejudicial as well as erroneous.[10] By not identifying what the extraneous information was — i.e., the actual content of the televised interview with Smith's mother — the judge rendered himself unable to make the necessary "determination [of] . . . the likelihood that the material reached . . . more jurors," *Commonwealth* v. *Jackson*, 376 Mass. at 800, and the requisite "assess[ment of] the possible prejudicial effect of the jury's exposure to [the] extraneous information, and weigh[ing of] the impact of the extraneous information on the jurors." *Commonwealth* v. *Kamara*, 422 Mass. at 616. The judge's inaction allowed the jury to continue

---

[9]The defendant argues that the judge's error in failing to provide a meaningful opportunity to assist in framing a response to the jury note is to be evaluated under the "harmless beyond a reasonable doubt" standard for constitutional errors. He relies on the application of that standard in *Commonwealth* v. *Bacigalupo*, 49 Mass. App. Ct. at 634, but overlooks the fact that in that case defense counsel did object, if only partially and incompletely, to the judge's answering the jury as he did. *Id.* at 631-632. Even errors of constitutional dimension are subject to waiver if not properly preserved at trial. See *Commonwealth* v. *Watson*, 409 Mass. 110, 112 (1991); *Commonwealth* v. *Curtis*, 417 Mass. at 626; *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 14 (1986).

[10]Although it is within the judge's "sound discretion," *Commonwealth* v. *Federici*, 427 Mass. 740, 747 (1998), to determine whether extraneous material "raises a serious question of possible prejudice," *Commonwealth* v. *Jackson*, 376 Mass. at 800, here the judge entirely failed to exercise that discretion. Failure to exercise discretion is itself an abuse of discretion. *Commonwealth* v. *Manning*, 47 Mass. App. Ct. 923 (1999).

deliberating while in possession of information that they may well have weighed adversely to the defendant.

That risk was made manifest in the course of the postverdict voir dire. As noted above, it disclosed that the juror mentioned in the note had heard Smith's mother in effect denouncing the defendant's charged abuse as the cause of the later criminality of her son (who would not otherwise have been so inclined). Had such a revelation been made at the time the judge received the note, there would, in all probability, have been further inquiry as to the exposure of other jurors to that condemnation, either by defense counsel roused from his apparent lethargy by the potentially harmful nature of the information or sua sponte by the judge. Such questioning would have uncovered the facts that at least three other jurors had been made aware of the potentially inflammatory content of the program[11] and that there had been some degree of discussion about it among the jurors during the deliberations.

"The facts of the specific case are important" in estimating the harm caused by jury exposure to extraneous information, and "[a]ny possibility of taint because of the . . . juror's [injection of the interview with Smith's mother into the deliberations] must be appraised in light of the evidence." *Commonwealth* v. *Kamara*, 422 Mass. at 616, 619. Here, the evidence against the defendant was far from overwhelming. Although Smith testified in surprising detail to the defendant's alleged acts of abuse that he had denied almost a quarter century earlier, no physical or other evidence supported his story, no other witnesses observed or were told of the events depicted, no contemporary investigations or reports had established or corroborated his claimed victimization at the defendant's hands, and there was significant evidence that raised questions as to Smith's veracity and motives.[12]

In short, the case against the defendant rested entirely on the

---

[11]One of those jurors recalled that Smith's mother had portrayed him as a "good boy" prior to meeting the defendant, while another reported that the "mother [had] blam[ed] the incident that happened [with the defendant] . . . for [Smith's] problems for the rest of his life."

[12]Not only had Smith in 1974 denied that the defendant had ever abused him, but he had remained friendly with the defendant throughout the 1970's and 1980's, visiting him in Canada and writing him warmly on frequent

jury's accepting Smith's belated accounts of molestation as credible. The Commonwealth sought to bolster Smith's credibility in direct examination by having him acknowledge his extensive and varied record of convictions for serious crimes while characterizing that history as "an adult criminal record."[13] The Commonwealth then contrasted that "adult record" against a carefully laid background that depicted Smith as a mere runaway and truant when he was first committed to the defendant's care. The prosecutor took pains in his summation to remind the jury of that presentation. He stressed that Smith and Jones had only been "adolescent boys" when they were "given over to the care and custody of this man," the defendant, "who controlled their lives . . . twenty-four hours a day" and that "their criminal records . . . happened since [the defendant] abused them."

With no instructions from the judge, there was a substantial risk that the jury could take the information provided in Smith's mother's interview as strongly reinforcing the Commonwealth's portrayal of Smith as a relative innocent whose life of crime could be attributed to the defendant's traumatizing sexual abuse. The extraneous material lent added and undue weight to an otherwise unattractive and questionable complaining witness and to a Commonwealth case that was not robust. At the very least, the judge's mistakes in handling the extraneous information deprived the defendant of the possibility of mitigating such a prejudicial impact on jury deliberations by means of the kind of prompt, clear, forceful and specific limiting instructions that have been found to neutralize the likelihood of prejudice from

---

occasions. Smith had only made his accusations against the defendant in 1992, when he was facing charges for several serious crimes that subjected him to the possibility of life sentences and the loss of the right ever to visit his child. Additionally, he had at the time discussed bringing an action for damages against the defendant and the Assumptionist Order with several attorneys active in litigation against priests accused of sexual abuse.

[13]Smith's convictions included repeated assault and battery by means of a dangerous weapon, receiving stolen property, unarmed robbery, uttering forged instruments, larceny, arson, and assault with the intent to commit rape, as a result of which he had spent over half of his post-Come Alive years in prison.

extrajudicial material brought to a jury's attention.[14] By contrast, the judge's contemporaneous and final instructions here were generic and stereotypical, failing (unsurprisingly) to make specific reference to (much less cure) the potentially prejudicial information, the nature of which he did not even discover until after verdicts had been returned.

In light of the socially abhorrent nature of the conduct with which the defendant was charged, compare *Commonwealth* v. *Lavigne*, 42 Mass. App. Ct. 313, 314-316 (1997), the underwhelming character of the Commonwealth's case, the damaging potential of the extrajudicial material, and the lack of effective limiting instructions, this case could well be deemed to be that foreseen in *Commonwealth* v. *Kamara*, 422 Mass. at 619, in which "the extraneous information so contaminated the jury that, despite their assurances that they sincerely believed that they could do the job right, despite the judge's [ultimate] finding that they could [and did] do so and that there was no reason to believe that they [did] not do so, and despite the judge's [general] instructions to disregard any information not in evidence, we should conclude that the jury could not avoid being influenced in some prejudicial degree by the extraneous information."

*Improper prosecutorial argument.* Even if we were not persuaded that the insufficient exploration of the extraneous information to which the jurors were exposed created a substantial risk of a miscarriage of justice, we would nonetheless resolve any doubt we might still entertain on that score in the defendant's favor. See *Commonwealth* v. *Welcome*, 348

---

[14]See *Commonwealth* v. *Stanley*, 363 Mass. 102, 105-106 (1973) (judge provided adequate curative instructions to disregard utterly a newspaper article adverse to the defendant that had been brought into the jury room and read by some jurors, not only at the time the matter arose, but also at the end of that same day, the following day, and in his general charge); *Commonwealth* v. *Jackson*, 376 Mass. at 798, 799 & n.4 (judge, immediately upon hearing of juror exposure to radio and newspaper publicity mentioning serious additional charges against the defendant, gave prompt cautionary instructions to ignore that information and any other media references to the defendant, which he repeated later during the trial and in his final charge); *Commonwealth* v. *Kamara*, 422 Mass. at 616, 619 & n.2 (judge gave instructions explicitly telling the jury to ignore and refrain from considering the specific extraneous information that had been disclosed as coming to the jury's attention).

Mass. 68, 70 (1964). That is because of the additional prejudice that flowed from a portion of the prosecutor's closing argument that effectively vouched for Smith's credibility on the basis of facts and improper opinion not in evidence.

The principal themes of the cross-examination of Smith and defense counsel's closing had been to ask the jury to consider skeptically not only his suspect character and motivations (see notes 12 and 13, *supra*), but also the dubious facts of his two-decade long delay in making his accusations and his continued contact with and expressed affection for the defendant long after the supposed abuse. In response, the prosecutor stated (without objection from defense counsel):

> "You know, for the defense to read those letters to you and say, well, this proves that he never got abused by [the defendant], look at these letters, how could you match these two things together if he wrote these letters from 1981 to 1986 to [the defendant], it couldn't have happened back in the early seventies that he was sexually abused as a child, it couldn't happen. The defense view of human relationships, I suggest to you, is far too narrow. It is not unusual in relationships to have abuse on one side and the relationship to continue to exist on the other side whether it's alcohol abuse or drug abuse or spousal abuse . . . . A twelve year old boy or girl gets molested by an uncle, . . . or a boy by his aunt or his mother, does he never talk to her again? Does he ever seek any advice? Is the relationship over? Does alcohol end all aspects of all relationships with people? It's narrow minded to suggest that because [Sam Smith] sent these letters, these innocent kinds of naive appearing letters to [the defendant] looking for guidance, despite everything that this man had done for [*sic*] him it's typical of human behavior, of people who have emotional difficulties, relationship difficulties."

The prosecutor's sweeping proposition that victims of sexual (or any other) abuse commonly delay disclosure of that abuse and maintain relationships with their abuser had not been the subject of testimony at trial, and the record is devoid of anything to support it. Such matters are beyond the common knowledge of jurors and would have required expert opinion to establish them. See *Commonwealth* v. *Dockham*, 405 Mass. 618, 629-630

(1989); *Commonwealth* v. *Frangipane*, 433 Mass. 527, 534 (2001). As no such testimony was offered, the prosecutor was impermissibly arguing facts that were not in evidence and were beyond the range of what the jury could reasonably infer. See *Commonwealth* v. *Clary*, 388 Mass. 583, 590 (1983); *Commonwealth* v. *Kozec*, 399 Mass. 514, 516 & n.2 (1987).

The prejudicial consequences of the prosecutorial presumption to provide expert opinion were not confined to collateral issues. They rather went to "the very heart of the case," *Commonwealth* v. *Shelley*, 374 Mass. 466, 471 (1978): the credibility of Smith, the sole source of evidence of the defendant's alleged acts of abuse against him. While the judge gave a brief, bland, standard instruction that arguments of counsel are not evidence, proof of the defendant's guilt was nonexistent aside from Smith's accusations, so we are compelled to "conclude that such instructions could not have served to neutralize the prejudicial effect of the prosecutor's remarks." *Ibid.* See also *Commonwealth* v. *Clary*, 388 Mass. at 591; *Commonwealth* v. *Kelly*, 417 Mass. 266, 271 (1994); *Commonwealth* v. *Frangipane*, 433 Mass. at 537; *Commonwealth* v. *Gallego*, 27 Mass. App. Ct. 714, 719-720 (1989); *Commonwealth* v. *Griffith*, 45 Mass. App. Ct. 784, 789 (1998).

Even though the defendant made no timely objection at trial, we may weigh this prosecutorial "error . . . with the other deficiencies [discussed above] . . . on the disputed issue of" Smith's credibility. *Commonwealth* v. *McLaughlin*, 433 Mass. 558, 563 (2001), quoting from *Commonwealth* v. *Carlino*, 429 Mass. 692, 695 (1999). Considering the circumstances of the entire case, particularly in the context of a prosecution entirely dependent upon Smith's credibility, we have serious reservations as to the integrity of the guilty verdicts, and "we are left with the clear opinion that these [combined] errors have resulted in a substantial risk of a miscarriage of justice." *Commonwealth* v. *Cancel*, 394 Mass. 567, 576 (1985). See *Commonwealth* v. *Bassett*, 21 Mass. App. Ct. 713, 717-718 (1986); *Commonwealth* v. *Clark*, 23 Mass. App. Ct. 375, 382-383 (1987); *Commonwealth* v. *Kowalski*, 33 Mass. App. Ct. 49, 51 (1992); *Commonwealth* v. *Meuse*, 38 Mass. App. Ct. 772, 776-777 (1995), *S.C.*, 423 Mass. 831 (1996) (defendants did not receive

a fair trial because of unobjected-to cumulative errors where the Commonwealth's cases were not strong, the decisive issue in each case was credibility, and the errors went to that very issue).

*Other issues.* We briefly comment on other contentions made by the defendant that might arise in any new trial. His claim that the motion judge erred in refusing to dismiss the charges against him based upon the loss of records relating to the case by the Worcester police department sometime in the late 1970's or early 1980's is without merit.[15] Although the judge found the police to have been negligent in losing files in an open case, she properly discharged her obligations when faced with a loss of potentially exculpatory evidence, as set forth in *Commonwealth v. Willie*, 400 Mass. 427, 432 (1987), by weighing the Commonwealth's culpability, the materiality of the lost material, and the potential prejudice to the defendant.

The judge found no bad faith on the part of the police and substantial defense responsibility for any prejudice arising from the loss of the records because of the lengthy delay in prosecuting the matter caused by the defendant's flight to Canada to avoid prosecution (see note 3, *supra*). She emphasized the defendant's inability to demonstrate any specific prejudice and his reliance on mere speculation that lost interview reports may have contained helpful impeachment material. Most critically, she determined that there was no actual prejudice with respect to Smith, because the substance of any inconsistency for impeachment purposes was still available to the defendant in the form of Smith's testimony at the hearing acknowledging his 1974 denial that the defendant had sexually assaulted him when questioned by the police. The defendant has failed to demonstrate any error in the motion judge's findings or any abuse of her wide discretion when she denied his motion for a dismissal to the extent it was grounded on the lost records. See *id.* at 434. See also *Commonwealth v. Troy*, 405 Mass. 253, 261-262 (1989); *Commonwealth v. Olszewski*, 416 Mass. 707, 716-717

---

[15]It was unclear when or in what circumstances the records were lost, but the loss was apparently associated with the department's relocation into a new building in 1979, with the record being unaccountably disposed of sometime thereafter. The lost records likely included police interview notes with ten to twelve boys in 1974, including Smith, related in some way to the abuse charges against the defendant.

(1993), cert. denied, 513 U.S. 835 (1994); *Commonwealth* v. *Harwood*, 432 Mass. 290, 295, 302-303 (2000).

The defendant contends that the trial judge erred in not declaring a mistrial, on his motion, when the investigating officer testified to trying to locate the "victims" in 1992 after he discovered the loss of the 1974 police interview files. His argument fails in light of the relatively harmless context in which the isolated reference occurred, as well as his candid recognition that declaring a mistrial is a drastic last resort, the propriety of which lies entirely within the judge's discretion. That discretion was properly exercised here on the reasonable basis that the officer was referring only to the two complaining witnesses at trial. Moreover, it could have had at most merely a cumulative impact because the jury had been told in the course of the officer's earlier, unobjected-to testimony that the police had interviewed ten or twelve youths at Come Alive and taken statements from many of them during their investigation of the abuse charges against the defendant. We assume that in any new trial similar testimony that might arguably be deemed a potentially prejudicial reference to uncharged criminal behavior will be avoided.

Finally, a letter from the defendant to his attorney was mistakenly transmitted to the jury.[16] In it, the defendant ambiguously refers to persons the attorney had contacted "re/fugitive" and gives his attorney a detailed description of where he had worked and resided in Canada at various times. The defendant frames this issue as an ineffective assistance of counsel claim but does not actually allege that the letter was submitted to the jury as the result of any action (or inaction) of his trial counsel. We agree with the Commonwealth that we have an insufficient record on which to evaluate the claimed ineffectiveness. See *Commonwealth* v. *McCormick*, 48 Mass. App. Ct. 106, 107-108 (1999). Additionally, the defendant's conclusory assertion that the reference was "extremely prejudicial" is unsupported by reasoned argument or citation to authority, contrary to Mass.

---

[16]Upon inquiry from the jury why they had this letter (which had not been introduced in evidence), the judge took it back with instructions that it was not evidence and that the jury "strike" it from their minds and disregard it in their deliberations. Defense counsel made no objection or motion for a mistrial.

R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). In any event, we may safely assume that this mistake, however it occurred, will not be repeated in any new trial.

*Judgments reversed.*

*Verdicts set aside.*